**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**NICOLA BEVACQUA**
97 Taylortown Road
Montville, New Jersey 07045

*And*

**ANTHONY BUCK**
52493 Storbelt Lane
Macomb, Michigan 48042

*And*

**WILLIAM CAMPBELL AND**
**ANGELA MARIE CAMPBELL, h/w**
204 Hickory Drive
Seguin, Texas 78155

*And*

**ERIN COOPER AND**
**TRAVIS LEE MCQUEEN, h/w**
142 Meadow Brook Way
Centreville, Maryland 21617

*And*

**WENDELL CUASITO AND**
**KERI DAWN CUASITO, h/w**
8953 Candice Creek Court
Las Vegas, Nevada 89149

*And*

**JOHNNY DAVIS**
156 Calle Paraguay
San Juan, Puerto Rico 00917

*And*

**RUSSELL DYKEMA AND**
**HEATHER DYKEMA, h/w**
W205N17415 Spring Ridge Court
Jackson, Wisconsin 53037

**JURY TRIAL DEMANDED**

*And*

**STEPHEN FERNANDEZ**
9490 SW 30th Terrace, Unit 2
Ocala, Florida 34476

*And*

**RODNEY GASTON**
3305B Jefferson Street
Houston, Texas 77003

*And*

**CORDELL HAMILTON**
4142 Gail Boulevard
Naples, Florida 34104

*And*

**MARCOS HERNANDEZ**
548 Eleanor Court, Apt. E
Newport News, Virginia 23602

*And*

**CODY HIGGINS AND
ASHLEY RENAE HIGGINS, h/w**
1729 E. Sixth Avenue
Surtherlin, Oregon 97479

*And*

**CHARLES LASKEY-CASTLE**
121 S. 74 Street
Milwaukee, Wisconsin 53214

*And*

**MICHAEL LINGO**
5822 Red Sox Way, Unit 2
Billings, Montana 59101

*And*

**JOHN MCARTOR AND
ROSARIO MCARTOR, h/w**
1518 S. Kennicott Avenue
Arlington Heights, Illinois 60005

*And*

**BRIAN TENNANT AND
EHREN TENNANT, h/w**
17383 Breeze Road
Delta, Colorado 81416

*And*

**PAULO JACUZZI AND
JENNIFER JACUZZI, h/w**
1 Chenal Downs
Little Rock, Arkansas 72223

*And*

**MELVIN RIVERA AND
YASMIN RIVERA, h/w**
Calle 7 17 Jardines de Palmarejo
Canovanas, Puerto Rico 00729

*And*

**TIMOTHY RZASA**
508 Ellison Way
Augusta, Georgia 30907

*And*

**CHRISTIAN WUOLLET AND
LEIGHA FAITH WUOLLET, h/w**
415 Alcohol Road
Wrenshall, Minnesota 55797

*Plaintiffs,*

v.

**SIG SAUER, INC.**
72 Pease Boulevard
Newington, New Hampshire 03801

*Defendant.*

## PLAINTIFFS' COMPLAINT – CIVIL ACTION

### PARTIES

1.      The Plaintiffs in this action are a group of highly trained and experienced firearms users whose lives were upended by a dangerously defective pistol: the Sig Sauer P320.

2.      Upon the information discovered through research and document production, the Sig Sauer P320 is the most dangerous pistol sold in the United States market.

3.      The Plaintiffs in this action are federal law enforcement agents, police officers, combat veterans, firearms instructors, and civilians who have dedicated significant portions of their lives to the safe use of weapons.

4.      The Plaintiffs in this action trusted Sig Sauer to live up to its reputation as a designer and manufacturer of safe and reliable handguns.

5.      The Plaintiffs in this action trusted Sig Sauer to live up to its promise that the P320 "would not fire unless you want it to."

6.      The Plaintiffs in this action were lied to and let down by Sig Sauer, falling victim to the dangerously designed and manufactured P320.

7.      Plaintiff, Nicola Bevacqua ("Plaintiff" or "Bevacqua"), is an adult individual, citizen, and resident of the State of New Jersey residing at the above-captioned address.

8.      Plaintiff, Anthony Buck ("Plaintiff" or "Buck"), is an adult individual, citizen, and resident of the State of Michigan, residing at the above-captioned address.

9.      Plaintiff, William Campbell ("Plaintiff" or "Campbell"), is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

10.     Plaintiff, Angela Maria Campbell ("Plaintiff" or "Mrs. Campbell"), is the wife of William Campbell, an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

11.     Plaintiff, Erin Cooper ("Plaintiff" or "Cooper"), is an adult individual, citizen, and resident of Maryland, residing at the above-captioned address.

12.     Plaintiff, Travis Lee McQueen ("Plaintiff" or "Mr. McQueen"), is the husband of Erin Cooper, an adult individual, citizen, and resident of the State of Maryland, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

13.     Plaintiff, Wendell Cuasito ("Plaintiff" or "Cuasito"), is an adult individual, citizen, and resident of the State of Nevada residing at the above-captioned address.

14.     Plaintiff, Keri Dawn Cuasito, ("Plaintiff" or "Mrs. Cuasito"), is the wife of Wendell Cuasito, an adult individual, citizen, and resident of the State of Nevada, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

15.     Plaintiff, Johnny Davis ("Plaintiff" or "Davis"), is an adult individual, citizen, and resident of Puerto Rico, residing at the above-captioned address.

16.     Plaintiff, Russell Dykema ("Plaintiff" or "Dykema"), is an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address.

17.     Plaintiff, Heather Dykema ("Plaintiff" or "Mrs. Dykema"), is the wife of Russell Dykema, an adult individual, citizen, and resident of the State of Wisconsin, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

18.     Plaintiff, Stephen Fernandez ("Plaintiff" or "Fernandez"), is an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address.

19.     Plaintiff, Rodney Gaston ("Plaintiff" or "Gaston"), is an adult individual, citizen, and resident of the State of Texas, residing at the above-captioned address.

20.     Plaintiff, Cordell Hamilton ("Plaintiff" or "Hamilton"), is an adult individual, citizen, and resident of the State of Florida, residing at the above-captioned address.

21.     Plaintiff, Marcos Hernandez ("Plaintiff" or "Hernandez"), is an adult individual, citizen, and resident of the Commonwealth of Virginia, residing at the above-captioned address.

22.     Plaintiff, Cody Higgins ("Plaintiff" or "Higgins"), is an adult individual, citizen, and resident of the State of Oregon residing at the above-captioned address.

23.     Plaintiff, Ashley Renae Higgins ("Plaintiff" or "Mrs. Higgins"), is the wife of Cody Higgins, an adult individual, citizen, and resident of the State of Oregon, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

24.     Plaintiff, Charles Laske-Castle ("Plaintiff" or "Laskey-Castle"), is an adult individual, citizen, and resident of the State of Wisconsin residing at the above-captioned address.

25.     Plaintiff, Michael Lingo ("Plaintiff" or "Lingo"), is an adult individual, citizen, and resident of the State of Montana, residing at the above-captioned address.

26.     Plaintiff, John McArtor ("Plaintiff" or "McArtor"), is an adult individual, citizen, and resident of the State of Illinois, residing at the above-captioned address.

27.     Plaintiff, Rosario McArtor ("Plaintiff" or "Mrs. McArtor"), is the wife of John McArtor, an adult individual, citizen, and resident of the State of Illinois, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

28.     Plaintiff, Brian Tennant ("Plaintiff" or "Tennant"), is an adult individual, citizen, and resident of the State of Colorado residing at the above-captioned address.

29.     Plaintiff, Ehren Tennant ("Plaintiff" or "Mrs. Tennant"), is the wife of Brian Tennant, an adult individual, citizen, and resident of the State of Colorado, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

30.     Plaintiff, Paulo Jacuzzi ("Plaintiff" or "Jacuzzi"), is an adult individual, citizen, and resident of the State of Arkansas, residing at the above-captioned address.

31.     Plaintiff, Jennifer Jacuzzi ("Plaintiff" or "Mrs. Jacuzzi"), is the wife of Paulo Jacuzzi, an adult individual, citizen, and resident of the State of Arkansas, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

32.     Plaintiff, Melvin Rivera ("Plaintiff" or "Rivera"), is an adult individual, citizen, and resident of Puerto Rico, residing at the above-captioned address.

33.     Plaintiff, Yasmin Rivera, ("Plaintiff" or "Mrs. Rivera"), is the wife of Melvin Rivera, an adult individual, citizen, and resident of Puerto Rico, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

34.     Plaintiff, Timothy Rzasa ("Plaintiff" or "Rzasa"), is an adult individual, citizen, and resident of the State of Georgia, residing at the above-captioned address.

35.     Plaintiff, Christian Wuollet ("Plaintiff" or "Wuollet"), is an adult individual, citizen, and resident of the State of Michigan, residing at the above-captioned address.

36.     Plaintiff, Leigha Faith Wuollet ("Plaintiff" or "Mrs. Wuollett"), is the wife of Christian Wuollet, an adult individual, citizen, and resident of the State of Michigan, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

37.     Defendant, Sig Sauer, Inc. ("Sig Sauer" or "Sig Sauer") is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated under the laws of Delaware.

## JURISDICTION AND VENUE

38.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is perfect diversity of citizenship between the parties.  The defendant is a resident of the state of New Hampshire.  Each plaintiff resides in a state other than New Hampshire.  The amount in controversy exceeds $75,000.00.  The court may exercise personal jurisdiction over the defendant because it is a resident of New Hampshire.

39.     Venue is proper because a substantial part of the acts and omissions giving rise to this action occurred in New Hampshire.

## GENERAL ALLEGATIONS

40.     Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

41.     Sig Sauer was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007. Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

42.     The Sig Sauer P320 is susceptible to unintended discharges, meaning instances when a gun fires without user intent, at an alarmingly high rate.

43.     There have been over 150 incidents (and likely multiples more) of the Sig Sauer unintentionally discharging when users believed they did not pull the trigger.  Many of these unintended discharges have caused severe injury to the users and/or bystanders.

44.     The vast majority of these users are law enforcement officers, former military personnel, and/or trained and certified gun owners.

45.     At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency.

46.     This action seeks actual, compensatory, and enhanced compensatory damages, and equitable relief, relating to Defendant, Sig Sauer Inc.'s (hereinafter "Defendant" or "Sig Sauer"), negligence, defective design, and unfair and deceptive marketing practices regarding a firearm.

47.     Specifically, this matter involves a striker-fired pistol known as the "P320" that has fired without the trigger being pulled or deliberately actuated by the user, on numerous civilians and law enforcement agents across the nation.

48.     Prior to the incidents detailed below in this Complaint, Sig Sauer received multiple complaints and notifications of P320 pistols firing when the trigger was either not pulled, or not deliberately actuated by the user.

49.     In its "Safety Without Compromise" marketing materials for the P320, Sig Sauer promises:



**SAFETY WITHOUT COMPROMISE**

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

50.     Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired without the user deliberately pulling the trigger many, many times.

51.     Defendant, Sig Sauer, had knowledge long before the sales of the P320s used by Plaintiffs that the P320 - its first ever striker-fired pistol - was capable of firing unintentionally due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, a de-cocker, a hinged trigger, and/or a grip safety.

52.     For many years since the weapon was first introduced to the market in 2014, Sig Sauer has wantonly failed to recall the P320 despite knowing of scores of grievous wounds inflicted upon users and bystanders.

53.     Years before the incident occurred, through and including the date of Plaintiffs' incidents, which span from March 31, 2020 to January 24, 2023, Sig Sauer expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



54.     In additional marketing material, under the heading "Striker Safety," Sig Sauer further states: the striker safety "[p]revents the striker from being released unless the trigger is pulled."

55.     At the same time, Sig Sauer contradictorily stated in the original owner's manual for the P320, which warns on page 25, that the weapon could fire if dropped without the trigger being pulled if a round were "chambered," i.e., inside the firing chamber of the weapon's slide.

56.     Many U.S. law enforcement agencies, local police departments, military personnel at a commander's discretion, and private owners routinely carry pistols with a chambered round.

57.     Sig Sauer advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

58.     The "+ 1" represents a chambered round.

59.     Sig Sauer was aware of the latter fact at the time it designed and manufactured all its pistols, including the P320.  The P320 is the first striker-fired pistol[1] it has ever manufactured.

---

[1] A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. The P320 is designed so that the rearward movement of the slide places the striker under significant spring tension, making it ready to fire once it is released. The striker is held back by the weapon's sear.  In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue.



60.     Sig Sauer assembled the P320 using the same frame from an earlier hammer-fired Sig Sauer model, the P250.

61.     While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, Sig Sauer's prototype P320s exhibited nearly 200 malfunctions during Army testing.  The Army demanded that Sig Sauer fix all problems associated with the prototype.

62.     The United States Army only agreed to the purchase of the P320 after Sig Sauer committed to designing an external manual safety for every military gun sold.

63.     Of the nearly 20 models of non-military P320s, only one (1) model offers a manual external safety as an "option."

64.     Sig Sauer's custom-design program allows for hundreds of thousands of different configurations of the P320, but does not allow users to add any type of external safety.

65.     An external manual safety, at the time the subject gun was sold, was certainly technologically feasible for the P320.

66.     A properly functioning and active external manual safety, at the time the subject gun was sold, would preclude a properly functioning P320 from firing in an unintended fashion.

67.     Upon information and belief, every striker-fired pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

68.     Upon information and belief, Sig Sauer manufactures the only striker-fired pistols on the market that are not equipped with any form of external manual safety.

69.     Upon information and belief, every single-action pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, or de-cocker.

70.     Upon information and belief, Sig Sauer manufactures the only single-action pistols on the market that are not equipped with any form of external manual safety.

71.     Sometime after January 2017, when a Connecticut law enforcement agent was shot by a P320 that fell to the ground from less than three feet, Sig Sauer removed the warning on page 25 from the user manual regarding a chambered round, and replaced it with the following language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge.**

(emphasis in original).

72.     Defendant, Sig Sauer had never before represented that mere "vibration" could cause the weapon to discharge.

73.     Upon information and belief, no other firearms manufacturer has ever made such a representation.

74.     Sig Sauer acknowledges in its own manuals that vibrations can cause its safety mechanisms to fail to work as designed.

75.     Since the P320's manufacture and distribution into the stream of commerce, Sig

Sauer has expressly represented that the weapon possessed a "robust safety system":



76.     Despite their representations, Sig Sauer never made a tabbed trigger safety

available as an option for the P320.[2]

77.     In fact, Sig Sauer's original design and manufacture of the P320 rendered the

weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including

normal carrying, holstering, un-holstering, and/or handling.

78.     When Sig Sauer shipped P320s to dealers for sale to civilian consumers, Sig Sauer

knew or should have known that the weapon was defective in its design and unreasonably

dangerous for its ordinary uses, intended uses, and all other foreseeable uses and that un-

commanded discharges could occur in the ordinary course of using the weapon.

79.     Before Plaintiffs purchased their pistols, Sig Sauer was aware of other, prior un-

commanded discharges of the P320 platform, and other Sig Sauer pistols, many of which pre-dated

their purchases.

---

[2] A tabbed-trigger safety is a small tab within the trigger which must be depressed in order for
the entire trigger to be depressed; thus preventing incidental discharges.

80.     In 2015, a Pennsylvania State Trooper and firearms instructor killed another trooper with his Sig Sauer pistol when it discharged without a trigger pull while conducting safety training.

81.     In 2016, a tactical response training instructor near Sacramento dropped his Sig Sauer, firing a bullet into a student's truck.

82.     In the period between 2012 and 2015, the New York City Police Department reported 10 un-commanded discharges involving Sig Sauer weapons.

83.     In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, Police Officer's vehicle when the officer moved to exit the vehicle during a snowstorm.   The incident was captured on the Officer's body-worn camera.

84.     In 2016, the Surprise, Arizona, Police Department complained to Sig Sauer of two (2) separate incidents of P320s firing without trigger pulls.

85.     In October 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

86.     In November 2016, a P320 fired un-commanded on an Officer in Holmes Beach, Florida, striking him in his leg.

87.     In 2017 in Michigan, a Sheriff's Deputy's Sig Sauer pistol discharged without a trigger pull, striking a schoolteacher in the neck.

88.     On January 5, 2017, a P320 shot a Stamford, Connecticut, SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG SAUER's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

89.     On February 28, 2017, a P320 discharged without a trigger pull while in use by the University of Cincinnati Police Department.

90.     On June 14, 2017, a P320 discharged without a trigger pull in Wilsonville, Oregon.

91.     On June 20, 2017, a P320 discharged without a trigger pull while in use by the Howell Township, New Jersey Police Department.

92.     In June of 2017, Sig Sauer shipped approximately 800 P320s to the Loudoun County, Virginia, Sheriff's Department, privately assuring its leadership, Sheriff David Chapman. that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[3]

93.     On July 28, 2017, a P320 discharged without a trigger pull in Tarrant County, Texas.

94.     On August 4, 2017, the Stamford SWAT team member sued Sig Sauer in U.S. District Court in Connecticut for an un-commanded discharge of a commercial version of the P320 that shot him in his knee.

95.     Four days later, Sig Sauer's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

96.     This statement was false, in view of Sig Sauer's knowledge that Officer Sherperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other un-commanded discharges of the P320 had occurred before that date.

---

[3]     As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

97.     On August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standard for safety."

98.     This statement was also false, as there are no federal government standards for gun safety, a fact known to Sig Sauer when it issued this press release.

99.     No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

100.    Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnect switch, and an improved sear to prevent un-commanded discharges.

101.    On August 9, 2017, the Police Chief of Morrow, Georgia issued an emergency order removing the P320 from service.

102.    In October 2017, a P320 discharged without a trigger pull in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

103.    On November 12, 2017, a P320 discharged without a trigger pull in Dallas County, Texas.

104.    On February 2, 2018, Tyler Herman of McCloud, Oklahoma, was removing a holster containing his P320 from his belt. While in the process of removing the holster, and without him touching the trigger, Herman's P320 discharged, striking Herman and causing catastrophic injuries.

105.     On February 7, 2018, Loudoun County, Virginia, Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

106.     Months later in April 2018, Sig Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

107.     In May 2018, civilian Gunter Walker reported to Sig Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

108.     In June 2018, a Williams County, Ohio, Officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

109.     In May 2018, a Rancho Cucamonga, California, Officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

110.     In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

111.     In October 2018, retired Law Enforcement Officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

112.     In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused serve tunneling wounds to his right leg.

113.     On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual MayFair event near Harvard Square.

114.     The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a Sig Sauer certified armorer[4] on the P320.

115.     On July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts, Police Department hitting him in his leg and causing substantial injuries to his leg.

116.     In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway concourse. The incident was captured on video, and the officer was returned to duty the next day.

117.     The transit authority replaced all Sig Sauer P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved

---

[4] According to Sig Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty**.** Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.Sig Sauersaueracademy.com/course/armorer-certification

Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

118.    On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting his leg.

119.    On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts, Police Department, was shot by his P320 without him pulling the trigger. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

120.    On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

121.    On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California, Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

122.    The holster was a Safariland level three retention holster with a hood securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and fellow officers by inches as it ricocheted into a locker door.

123.    On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts, Police Department, as he was in the process of putting his duty belt on.

124.    Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to un-commanded discharges causing injury in both 2016 and 2017.

125.     On February 15, 2020, Pasco County Florida Sheriff's Deputy David Duff was injured when his P320 discharged without him pulling the trigger while the gun was in its holster on his duty belt.

126.     On February 27, 2020, Tampa Police Department Reserve Officer Howard Northrop was severely and permanently injured when his service-issued P320 discharged without a trigger pull, while inside his service-issued holster.

127.     Officer Northrop was struck in the left leg by a 9mm hollow-point bullet, which mushroomed and caused massive internal damage.

128.     On April 15, 2020, Yakima, Washington, Police Officer Nathan Henyan was injured when his P320 discharged from within its holster without him pulling the trigger.

129.     On June 19, 2020, Army veteran George Abrahams was injured when his P320 discharged without him pulling the trigger.

130.     At the time of Mr. Abrahams' incident, his P320 was contained within the holster which came in the box with his gun, which he was keeping in his pants pocket, which was fully zippered.

131.     On July 14, 2020, Milwaukee Police officer Adam Maritato was injured when his partner's duty-issued P320 discharged from within its holster while the two were attempting to detain a suspect.

132.     On July 27, 2020, ICE Agent Joseph Halase was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

133.     In 2020, a Wyoming Highway Patrol officer experienced an unintentional discharge, leading the Wyoming Highway Patrol to abandon the P320 as its standard duty weapon.

134.    On September 21, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Keith Slatowski of Immigration and Customs Enforcement during a training exercise in New Castle, Delaware.

135.    Slatowski's P320 fired while in its holster, and the casing did not eject.

136.    Slatowski was severely wounded and has not been able to return to duty since the accident as of the date of this filing.

137.    On November 9, 2020, Tampa Police Officer Jerry Wyche was injured when his holstered P320 discharged without him pulling the trigger as he was getting out of his police vehicle.

138.    On December 8, 2020, ICE Agent Catherine Chargualaf was injured when her P320 discharged from within its holster without her pulling the trigger during a training exercise.

139.    On January 23, 2021, civilian Timothy Davis was injured when his Sig Sauer P320 X-Carry discharged in its holster without a trigger pull.

140.    On April 1, 2021, ICE Agent Fernando Armendariz was injured when his duty-issued P320 discharged without his finger touching the trigger while he was in the process of holstering the pistol.

141.    On May 12, 2021, Department of Homeland Security Agent Amy Hendel was injured when her P320 discharged without her pulling the trigger during a training exercise.

142.    On June 2, 2021, Troy, New York Police Officer Michael Colwell suffered permanent injuries when his P320 discharged in his holster during a training exercise while his hands were not touching the gun.

143.    On June 15, 2021, Massachusetts resident Kyle Ellis was injured when her P320 discharged without her pulling the trigger while it was in its holster.

144.     On August 18, 2021, Richmond County, Georgia, Sheriff's Deputy James Garth was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

145.     On November 2, 2021, Florida resident Michael Parker was injured when his P320 discharged without him pulling the trigger while he was removing the fully holstered P320 from his pocket.

146.     On November 29, 2021, Atlantic County Prosecutor's Office Detective James Scoppa suffered severe tinnitus when his holstered P320 discharged without him pulling the trigger while he was inside of his car.

147.     On December 5, 2021, ICE Agent Mary Doffeny suffered severe emotional harm when her duty-issued P320 discharged from within a dedicated compartment in her purse.

148.     Ms. Doffeny' s incident was caught on video, which clearly shows the gun going off without her pulling the trigger.

149.     On January 15, 2022, Connecticut resident Zachary Brown was injured when his P320 discharged from within its holster without Mr. Brown pulling the trigger while he was attempting to remove the holster from his pants.

150.     On February 7, 2022, Honesdale, Pennsylvania, Police Officer Donald Thatcher's P320 discharged from its holster while he was exiting his car.

151.     Officer Thatcher's incident was captured on video, which clearly shows that Officer Thatcher's hands were not touching his holster at the time the P320 discharged.

152.     Following this incident, the Honesdale, Pennsylvania, Police Department pulled all P320s out of service and sued Sig Sauer for a refund of the firearms.

153.     On February 12, 2022, former Navy Small Arms Instructor Dionicio Delgado was injured when his P320 discharged from within its holster without him pulling the trigger.

154.     On February 26, 2022, Texas resident Juan Duran was injured when his P320 discharged without him pulling the trigger while it was in his holster.

155.     On March 28, 2022, Houston, Texas, Police Sergeant Marvin Reyes's P320 discharged from its holster while he was entering his car.

156.     Sergeant Reyes' incident was captured on video, which unmistakably shows that Sergeant Reyes's hands were not near his holster at the time the P320 discharged.

157.     On April 4, 2022, Georgia prosecutor Matthew Breedon was injured when his P320 discharged without him pulling the trigger while he was in the process of removing it from his holster.

158.     On May 25, 2022, former Georgia correctional officer and former Monticello, Georgia, police officer Dwight Jackson was injured when his holstered P320 discharged without him pulling the trigger.

159.     On September 10, 2022, a Milwaukee Police Officer's holstered P320 discharged while the officer was attempting to detain a suspect.

160.     Following this incident, the third in as many years involving a Milwaukee Police Officer, the Milwaukee Police Association filed a lawsuit against the City of Milwaukee to have the gun removed from service.

161.     In response to the incidents of Milwaukee Police Officers being injured by the P320, Milwaukee Police Chief Jeffrey Norman announced on October 31, 2022 that the Milwaukee Police Department would replace every single P320 in its arsenal with pistols manufactured by one of Sig Sauer's competitors.

162.     On November 7, 2022, Oklahoma resident William Clegg was injured when his P320 discharged from within its holster after making contact with a small wooden paddle.

163.     Between 2015-2022, there have been at least *nine* incidents where an Oklahoma Highway Patrol Officer had a P320 discharge when the officer did not pull the trigger.

164.     Internal documents from Immigration Customs Enforcement provide that unintended discharges skyrocketed within the agency once it switched its primary weapon from a Glock to the P320.

165.     Sig Sauer is aware of other claims of unintended discharges involving the P320 beyond those identified above.

166.     To date, Sig Sauer has never issued a mandatory recall of the P320 for repairs, though it has done so in the past for other of its products with far lesser sales.

167.     In an interview in 2013, Sig Sauer's former Chief Financial Officer, Timothy Scullin, just before the P320 was brought to market in 2014, noted that Sig Sauer's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that Sig Sauer's growth has outpaced the firearms' industry's growth by "two or three times."

168.     When asked what are some of his biggest professional challenges that he has faced in his career, he stated:

> At Sig Sauer, to grow this fast, people get really challenged.  When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down.  It just creates a tremendous of stress on the people in the system. But we've got people that have risen to the challenge.

169.     At all material times, the geographic location where the P320 was designed, manufactured, and placed into the stream of commerce was Sig Sauer's principal place of business in New Hampshire.

25

170.     At all material times, the geographic location of the actions and conduct Sig Sauer decided upon, initiated, and undertook as described in this Complaint was Sig Sauer's principal place of business in New Hampshire.

171.     At all material times, the geographic location of the marketing, communications and/or misrepresentations Sig Sauer decided upon, designed, created, initiated, engaged in and/or disseminated as described in this Complaint was Sig Sauer's principal place of business in New Hampshire.

172.     At all material times, Sig Sauer's principal place of business in New Hampshire was the geographic location of Sig Sauer's unfair and/or deceptive acts and/or practices in trade and commerce as described in this Complaint.

## PLAINTIFFS' INCIDENTS

### Nicola Bevacqua

173.     Prior to October 19, 2022, Nicola Bevacqua had undergone extensive firearms training as a gun owner.

174.     Prior to October 19, 2022, Bevacqua purchased a P320 for personal use.

175.     On October 19, 2022, Bevacqua racked the P320 while in his home and the pistol suddenly and unexpectedly discharged.

176.     Bevacqua did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

177.     The bullet struck Bevacqua in his left middle finger, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

178.     While the full extent of the physical damage to Bevacqua's finger and/or hand is not yet known, he has had (and it is likely that he will have) trouble grasping and using his hand as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

179.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Bevacqua was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Bevacqua has in the past and is reasonably likely to require medicines, medical care and treatment.  Bevacqua has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Bevacqua has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Bevacqua has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Bevacqua's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Bevacqua, who has received substantial and ongoing treatments and medicines.

**Anthony Buck**

180.     Prior to March 31, 2020, Anthony Buck had undergone extensive firearms training as a gun owner.

181.     Prior to March 31, 2020, Buck purchased a P320 for personal use.

182.     On March 31, 2020, while holstering the P320 in his home, Buck's pistol suddenly and unexpectedly discharged.

183.     Buck never touched the P320's trigger and did not intend to fire the gun.

184.     The bullet struck Buck in his left ring finger and knee, causing substantial injury, amputation of his finger, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

185.     While the full extent of the physical damage to Buck's hand and knee are not yet known, he has had (and it is likely that he will have) trouble grasping, running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

186.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Buck was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Buck has in the past and is reasonably likely to require medicines, medical care and treatment.  Buck has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Buck has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Buck has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Buck's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Buck, who has received substantial and ongoing treatments and medicines.

**William Campbell**

187.     Prior to June 5, 2021, William Campbell had undergone extensive firearms training as a gun owner.

188.     Prior to June 5, 2021, Campbell purchased a P320 for personal use.

189.     On June 5, 2021, Campbell racked the P320 slide, and the pistol suddenly and unexpectedly discharged.

190.     Campbell did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

191.     The bullet struck Campbell in his left pointer finger, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

192.     While the full extent of the physical damage to Campbell's finger and/or hand is not yet known, he has had (and it is likely that he will have) trouble grasping and using his hand as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

193.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Campbell was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Campbell has in the past and is reasonably likely to require medicines, medical care and treatment.  Campbell has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Campbell has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Campbell has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Campbell's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Campbell, who has received substantial and ongoing treatments and medicines.

**Erin Cooper**

194.     Prior to May 17, 2021, Erin Cooper had undergone extensive firearms training in her capacity as a police officer with the Metro Transit Police Department.

195.     Prior to May 17, 2021, Cooper was issued a P320 by the Metro Transit Police Department.

196.     On May 17, 2021, in Washington, D.C., Cooper's P320 pistol suddenly and unexpectedly discharged while she was putting on her duty belt.

197.     At the time of the unexpected discharge, Cooper's P320 was in its holster.

198.     Cooper never touched the P320's trigger and did not intend to fire the gun.

199.     The unintended discharge caused Cooper to sustain burns on her right thigh, along with tinnitus and severe emotional trauma.

200.     While the full extent of the physical damage Cooper sustained is not yet known, it is likely that she will likely never be able to return to her pre-incident form as a result of diminished physical capacity.

201.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Cooper was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Cooper has in the past and is reasonably likely to require medicines, medical care and treatment.  Cooper has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Cooper has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Cooper has in the past and may in the future continue to be disabled from performing her usual duties, occupations, and avocations, all to Cooper's great loss and detriment.

The incident has resulted in substantial physical harm and related trauma to Cooper, who has received substantial and ongoing treatments and medicines.

**Wendell Cuasito**

202.    Prior to October 4, 2022, Wendell Cuasito had undergone extensive firearms training as a gun owner.

203.    Prior to October 4, 2022, Cuasito purchased a P320 for personal use.

204.    On October 4, 2022, Cuasito was engaged in target practice at a range in Cold Creek, Nevada.

205.    On that date, Cuasito's P320 suddenly and unexpectedly discharged.

206.    Cuasito did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

207.    The bullet struck Cuasito in his right thigh and foot, causing substantial injury, maceration of tissue, blood loss, bone fractures, and nerve damage, along with severe emotional trauma.

208.    While the full extent of the physical damage to Cuasito's leg and foot is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

209.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Cuasito was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Cuasito has in the past and is reasonably likely to require medicines, medical care and treatment.  Cuasito has in the past and may in the future continue to be compelled to

expend monies and incur further obligations for such medical care and treatment. Cuasito has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Cuasito has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Cuasito's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Cuasito, who has received substantial and ongoing treatments and medicines.

**Johnny Davis**

210.     Prior to November 16, 2022, Johnny Davis had extensive firearms training and experience through his 26 years in law enforcement.

211.     Prior to November 16, 2022, Davis was issued a P320 by the Puerto Rico State Police.

212.     On November 16, 2022, in Dorado, Puerto Rico, Davis's holstered P320 suddenly and unexpectedly discharged when he adjusted his waistband.

213.     Davis did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

214.     The bullet struck Davis in his testicle and left thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

215.     While the full extent of the physical damage to Davis's body is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

216.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Davis was forced to suffer

serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet

to be determined.  Davis has in the past and is reasonably likely to require medicines, medical care

and treatment.  Davis has in the past and may in the future continue to be compelled to expend

monies and incur further obligations for such medical care and treatment. Davis has in the past and

may in the future continue to suffer agonizing aches, pains, and psychological and emotional

anguish.  Davis has in the past and may in the future continue to be disabled from performing his

usual duties, occupations, and avocations, all to Davis's great loss and detriment. The incident has

resulted in substantial physical harm and related trauma to Davis, who has received substantial and

ongoing treatments and medicines.

**Russell Dykema**

217.     Prior to November 29, 2022, Russell Dykema had extensive firearms training and

experience through more than 17 years in law enforcement.

218.     Prior to November 29, 2022, Dykema was issued a P320 by ICE.

219.     On November 29, 2022, in Milwaukee, Wisconsin, Dykema's holstered P320

suddenly and unexpectedly discharged as he exited his vehicle.

220.     Dykema did not place his finger onto the trigger within the trigger guard and did

not intend to fire the gun.

221.     The bullet struck Dykema in his right thigh and traveled down his leg into his

calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with

severe emotional trauma.

222.     While the full extent of the physical damage to Dykema's leg is not yet known,

he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before

the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

223.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Dykema was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Dykema has in the past and is reasonably likely to require medicines, medical care and treatment. Dykema has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Dykema has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Dykema has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Dykema's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Dykema, who has received substantial and ongoing treatments and medicines.

**Stephen Fernandez**

224.    Prior to October 11, 2021, Stephen Fernandez had extensive firearms training and experience through the National Park Service Seasonal Law Enforcement Academy at Southwestern Community in College in Franklin, North Carolina.

225.    Prior to October 11, 2021, Fernandez was issued a P320 by the law enforcement academy.

226.    On October 11, 2021, in Franklin, North Carolina, Fernandez's P320 suddenly and unexpectedly discharged as he attempted to remove the pistol from its holster while participating in training drills.

227.     Fernandez did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

228.     The bullet struck Fernandez in his left thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

229.     While the full extent of the physical damage to Fernandez's leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

230.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Fernandez was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Fernandez has in the past and is reasonably likely to require medicines, medical care and treatment.  Fernandez has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Fernandez has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Fernandez has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Fernandez's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Fernandez, who has received substantial and ongoing treatments and medicines.

**Rodney Gaston**

231.     Prior to November 10, 2022, Rodney Gaston had undergone extensive firearms training as a gun owner.

232.     Prior to November 10, 2022, Gaston purchased a P320 for personal use.

233.     On November 10, 2022, Gaston's P320 suddenly and unexpectedly discharged while it was in his right pocket as he walked in Houston, Texas.

234.     Gaston did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

235.     The bullet struck Gaston in his right calf and exited his ankle, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

236.     While the full extent of the physical damage to Gaston's leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

237.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Gaston was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Gaston has in the past and is reasonably likely to require medicines, medical care and treatment.  Gaston has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Gaston has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Gaston has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Gaston's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Gaston, who has received substantial and ongoing treatments and medicines.

**Cordell Hamilton**

238.     Prior to March 27, 2022, Cordell Hamilton had undergone extensive firearms training as a gun owner.

239.     Prior to March 27, 2022, Hamilton purchased a P320 for personal use.

240.     On March 27, 2022, in Immokalee, Florida, Hamilton's P320 suddenly and unexpectedly discharged when he holstered the pistol at the gun range.

241.     Hamilton did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

242.     The bullet struck Hamilton in his right foot, causing substantial injury, destruction of his metatarsal joint, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

243.     While the full extent of the physical damage to Hamilton's foot is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing or playing with his children as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

244.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Hamilton was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Hamilton has in the past and is reasonably likely to require medicines, medical care and treatment. Hamilton has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Hamilton has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Hamilton has in the past and may in the future continue to be disabled from

performing his usual duties, occupations, and avocations, all to Hamilton's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Hamilton, who has received substantial and ongoing treatments and medicines.

**Marcos Hernandez**

245.    Prior to January 24, 2023, Marcos Hernandez had undergone extensive firearms training in his capacity as a Virginia State Trooper.

246.    Prior to January 24, 2023, Hernandez was issued a P320 for by the Virginia State Police Department.

247.    On January 24, 2023, in Chesapeake, Virginia, Hernandez's holstered P320 suddenly and unexpectedly discharged as he walked into his office building.

248.    Hernandez did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

249.    The bullet struck Hernandez in his right thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

250.    While the full extent of the physical damage to Hernandez's leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, sitting or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

251.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Hernandez was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Hernandez has in the past and is reasonably likely to require medicines, medical care and treatment. Hernandez has in the past and may in the future continue to be

compelled to expend monies and incur further obligations for such medical care and treatment. Hernandez has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Hernandez has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Hernandez's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Hernandez, who has received substantial and ongoing treatments and medicines.

**Cody Higgins**

252.    Prior to November 13, 2022, Cody Higgins had extensive experience with firearms while serving as a firearms instructor in the United States Army.

253.    Prior to November 13, 2022, Higgins purchased a P320 for everyday carry.

254.    On November 13, 2022, in Oakland, Oregon, Higgin's P320 suddenly and unexpectedly discharged when he holstered the pistol.

255.    Higgins did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

256.    The bullet struck Higgins in his right buttock, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

257.    While the full extent of the physical damage to Higgins' buttock is not yet known, he has had (and it is likely that he will have) trouble walking, running, sitting or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

258.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Higgins was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet

to be determined.  Higgins has in the past and is reasonably likely to require medicines, medical care and treatment. Higgins has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Higgins has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Higgins has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Higgins' great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Higgins, who has received substantial and ongoing treatments and medicines.

**Charles Laskey-Castle**

259.     On September 10, 2022, Milwaukee Police Department Officer Laskey-Castle worked with Officer Yang Lee on a crime scene investigation in Milwaukee, Wisconsin.

260.     Prior to September 10, 2022, Officer Laskey-Castle and Officer Lee had undergone extensive firearms training in their capacity as police officers.

261.     Prior to September 10, 2022, Officer Lee was issued a P320 by the City of Milwaukee Police Department.

262.     On September 10, 2022, Officer Lee's holstered P320 suddenly and unexpectedly discharged in proximity to Officer Laskey-Castle.

263.     Officer Lee did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

264.     The bullet struck Officer Laskey-Castle in his left thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

265.     While the full extent of the physical damage to Officer Laskey-Castle's thigh is not yet known, he has had (and it is likely that he will have) trouble walking, running, sitting or

standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

266.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Laskey-Castle was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Laskey-Castle has in the past and is reasonably likely to require medicines, medical care and treatment. Laskey-Castle has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Laskey-Castle has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Laskey-Castle has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Laskey-Castle's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Laskey-Castle, who has received substantial and ongoing treatments and medicines.

**Michael Lingo**

267.     Prior to January 7, 2023, Michael Lingo had undergone firearms training as a gun owner and competitive shooter.

268.     Prior to January 7, 2023, Lingo purchased a P320 for personal use.

269.     On January 7, 2023, in Logan, Montana, Lingo's holstered P320 suddenly and unexpectedly discharged while at a gun range.

270.     Lingo did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

271.     The bullet struck Lingo in his right calf, traveled down his leg and came to rest in his right foot, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

272.     While the full extent of the physical damage to Lingo's leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

273.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Lingo was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Lingo has in the past and is reasonably likely to require medicines, medical care and treatment. Lingo has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Lingo has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Lingo has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Lingo's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Lingo, who has received substantial and ongoing treatments and medicines.

**John McArtor**

274.     Prior to July 19, 2022, John McArtor had extensive firearms training and experience an ICE agent.

275.     Prior to July 19, 2022, McArtor was issued a P320 by ICE.

276.     On July 19, 2022, in Illinois, McArtor's P320 suddenly and unexpectedly discharged when he holstered the pistol.

277.     McArtor never touched the P320's trigger and did not intend to fire the gun.

278.     The bullet struck McArtor in his right thigh and traveled down his leg into his calf, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

279.     While the full extent of the physical damage to McArtor's leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

280.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, McArtor was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  McArtor has in the past and is reasonably likely to require medicines, medical care and treatment. McArtor has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. McArtor has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  McArtor has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to McArtor's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to McArtor, who has received substantial and ongoing treatments and medicines.

**Brian Tennant**

281.     Prior to January 1, 2020, Brian Tennant had undergone extensive firearms training as a gun owner.

282.     Prior to January 1, 2020, Tennant purchased a P320 for personal use.

283.     On January 1, 2020, in his home, Tennant's fully holstered P320 suddenly and unexpectedly discharged.

284.     Tennant did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

285.     The bullet struck Tennant in his right hip, causing substantial injury, maceration of tissue, blood loss, bone fractures, and nerve damage, along with severe emotional trauma.

286.     While the full extent of the physical damage to Tennant's hip is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

287.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Tennant was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Tennant has in the past and is reasonably likely to require medicines, medical care and treatment.  Tennant has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Tennant has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Tennant has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Tennant's great loss and detriment.

The incident has resulted in substantial physical harm and related trauma to Tennant, who has received substantial and ongoing treatments and medicines.

**Paulo Jacuzzi**

288.    Prior to November 26, 2022, Paulo Jacuzzi had undergone firearms training in his personal capacity as a gun owner.

289.    Prior to November 26, 2022, Jacuzzi purchased a P320 for personal use.

290.    On November 26, 2022, Jacuzzi racked the P320 slide and the pistol suddenly and unexpectedly discharged.

291.    Jacuzzi did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

292.    The bullet struck Jacuzzi in his left hand and thigh, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

293.    While the full extent of the physical damage to Jacuzzi's hand and thigh is not yet known, he has had (and it is likely that he will have) trouble grasping and using his hand and walking, running, standing and/or sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

294.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Jacuzzi was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Jacuzzi has in the past and is reasonably likely to require medicines, medical care and treatment.  Jacuzzi has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Jacuzzi has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and

emotional anguish.  Jacuzzi has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Jacuzzi's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Jacuzzi, who has received substantial and ongoing treatments and medicines.

**Melvin Rivera**

295.     Prior to October 18, 2022, Melvin Rivera had extensive firearms training and years of law enforcement and military experience.

296.     Prior to October 18, 2022, Rivera was issued a P320 by the Puerto Rico State Police.

297.     On October 18, 2022, in Carolina, Puerto Rico, Rivera's holstered P320 suddenly and unexpectedly discharged while in his waistband.

298.     Rivera never touched the P320's trigger and did not intend to fire the gun.

299.     The bullet struck Rivera in his right leg near his groin and traveled to his knee, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

300.     While the full extent of the physical damage to Rivera's leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

301.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Rivera was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Rivera has in the past and is reasonably likely to require medicines, medical

care and treatment.  Rivera has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Rivera has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Rivera has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Rivera's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Rivera, who has received substantial and ongoing treatments and medicines.

**Timothy Rzasa**

302.     Prior to July 31, 2021, Timothy Rzasa had undergone extensive firearms training in his capacity as a police officer.

303.     Prior to July 31, 2021, Rzasa was issued a P320 by the Richmond County Sheriff's Office.

304.     On July 31, 2021, in Augusta, Georgia, Rzasa's P320 suddenly and unexpectedly discharged when he holstered the pistol.

305.     Rzasa did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

306.     The bullet struck Rzasa in his right thigh and traveled to his knee, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

307.     While the full extent of the physical damage to Rzasa's leg is not yet known, he has had (and it is likely that he will have) trouble walking, running, sitting or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

308. As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Rzasa was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Rzasa has in the past and is reasonably likely to require medicines, medical care and treatment. Rzasa has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Rzasa has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Rzasa has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Rzasa's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Rzasa, who has received substantial and ongoing treatments and medicines.

**Christian Wuollet**

309. Prior to April 14, 2022, Christian Wuollet had undergone firearms training as a gun owner.

310. Prior to April 14, 2022, Wuollet purchased a P320 for personal use.

311. On April 14, 2022, in Duluth, Minnesota, Wuollet's P320 suddenly and unexpectedly discharged while holstering the pistol.

312. Wuollet did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

313. The bullet struck Wuollet in his right buttock, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

314. While the full extent of the physical damage to Wuollet's right buttock is not yet known, he has had (and it is likely that he will have) trouble walking, running, standing and/or

sitting as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

315.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Wuollet was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Wuollet has in the past and is reasonably likely to require medicines, medical care and treatment.  Wuollet has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Wuollet has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Wuollet has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Wuollet's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Wuollet, who has received substantial and ongoing treatments and medicines.

## COUNT I – NEGLIGENCE
## NICOLA BEVACQUA V. SIG SAUER

316.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

317.     At all relevant times, Sig Sauer owed Bevacqua the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

318.     At all relevant times, Sig Sauer owed Bevacqua the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

319.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Bevacqua, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

320.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Bevacqua, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

321.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

322.    The gun's defective condition was not visible, and Bevacqua was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

323.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the October 19, 2022, unintended discharge and Bevacqua's injuries.

324.    As a direct and proximate result of the negligence set forth in this Count, Bevacqua suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Bevacqua will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II - STRICT PRODUCT LIABILITY
### NICOLA BEVACQUA V. SIG SAUER

325.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

326.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

327.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

328.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

329.    The defective condition of the P320 caused Plaintiff's injuries.

330.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT III – VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### NICOLA BEVACQUA V. SIG SAUER

331.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

332.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

333.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Bevacqua, entitling Bevacqua to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

## COUNT IV – NEGLIGENCE
## ANTHONY BUCK V. SIG SAUER

334.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

335.     At all relevant times, Sig Sauer owed Buck the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

336.     At all relevant times, Sig Sauer owed Buck the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

337.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Buck, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

338.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Buck, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

    xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

    xiv.   Other negligent acts and omissions to be developed in the course of discovery.

339.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

340.    The gun's defective condition was not visible, and Buck was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

341.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the March 31, 2020, unintended discharge and Buck's resultant injuries.

342.    As a direct and proximate result of the negligence set forth in this Count, Buck suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Buck will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT V - STRICT PRODUCT LIABILITY
### ANTHONY BUCK V. SIG SAUER

343.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

344.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

345.     The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

346.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

347.     The defective condition of the P320 caused Plaintiff's injuries.

348.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VI – VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### ANTHONY BUCK V. SIG SAUER

349.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

350.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

351.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Buck, entitling Buck to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VII - NEGLIGENCE
### WILLIAM CAMPBELL V. SIG SAUER

352.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

353.     At all relevant times, Sig Sauer owed Campbell the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

354.     At all relevant times, Sig Sauer owed Campbell the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

355.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Campbell, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

356.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Campbell, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

<div style="margin-left:2em">

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

</div>

357.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

358.    The gun's defective condition was not visible and Campbell was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

359.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the August 4, 2020 unintended discharge and Campbell's resultant injuries.

360.     As a direct and proximate result of the negligence set forth in this Count, Campbell suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.   These injuries are either permanent or continuing in their nature and Campbell will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT VIII - STRICT PRODUCT LIABILITY
### WILLIAM CAMPBELL V. SIG SAUER

361.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

362.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

363.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

364.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

365.    The defective condition of the P320 caused Plaintiff's injuries.

366.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT IX – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### WILLIAM CAMPBELL V. SIG SAUER

367.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

368.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

369.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Campbell, entitling Campbell to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

## COUNT X – NEGLIGENCE
## ERIN COOPER V. SIG SAUER

370.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

371.     At all relevant times, Sig Sauer owed Cooper the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

372.     At all relevant times, Sig Sauer owed Cooper the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

373.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Cooper, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

374.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Cooper, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.  By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

375.  Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

376.  The gun's defective condition was not visible, and Cooper was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

377.  Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the May 17, 2021, unintended discharge and Cooper's resultant injuries.

378.  As a direct and proximate result of the negligence set forth in this Count, Cooper suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for her care and treatment.  These injuries are either permanent or continuing in their nature and Cooper will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in her favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XI - STRICT PRODUCT LIABILITY
### ERIN COOPER V. SIG SAUER

379.  Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

380.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

381.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

382.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

383.    The defective condition of the P320 caused Plaintiff's injuries.

384.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XII – VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### ERIN COOPER V. SIG SAUER

385.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

386.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

387.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Cooper, entitling Cooper to mandatory doubling and discretionary trebling of her actual damages, as well as her reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XIII – NEGLIGENCE
### WENDELL CUASITO V. SIG SAUER

388.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

389.     At all relevant times, Sig Sauer owed Cuasito the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

390.     At all relevant times, Sig Sauer owed Cuasito the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

391.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Cuasito, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

392.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Cuasito, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

393.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

394.    The gun's defective condition was not visible, and Cuasito was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

395.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the October 4, 2022, unintended discharge and Cuasito's resultant injuries.

396.     As a direct and proximate result of the negligence set forth in this Count, Cuasito suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.   These injuries are either permanent or continuing in their nature and Cuasito will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XIV - STRICT PRODUCT LIABILITY
### WENDELL CUASITO V. SIG SAUER

397.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

398.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

399.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

400.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

401.    The defective condition of the P320 caused Plaintiff's injuries.

402.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>**COUNT XV – VIOLATION OF NEW HAMPSHIRE**</u>
<u>**CONSUMER PROTECTION ACT**</u>
**WENDELL CUASITO V. SIG SAUER**

403.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

404.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

405.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Cuasito, entitling Cuasito to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in their favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

### COUNT XVI – NEGLIGENCE
### JOHNNY DAVIS V. SIG SAUER

406.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

407.     At all relevant times, Sig Sauer owed Davis the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

408.     At all relevant times, Sig Sauer owed Davis the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

409.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Davis, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

410.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

   i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

   ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii. By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv. By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi. By negligently failing to unambiguously warn purchasers and end users of the gun, including Davis, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii. By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix. By including a defective and improper holster in the original packaging with the gun;

x. By misrepresenting the dangers and hazards posed by the gun;

xi. By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber.

xiii.  By failing to incorporate safeties which were standard among all of the P320s' competitors.

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

411.  Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

412.  The gun's defective condition was not visible, and Davis was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

413.  Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 16, 2022, unintended discharge and Davis' resultant injuries.

414.  As a direct and proximate result of the negligence set forth in this Count, Davis suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Davis will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XVII - STRICT PRODUCT LIABILITY
### JOHNNY DAVIS V. SIG SAUER

415.  Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

416.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

417.     The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

418.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

419.     The defective condition of the P320 caused Plaintiff's injuries.

420.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XVIII – VIOLATION OF NEW HAMPSHIRE
### CONSUMER PROTECTION ACT
**JOHNNY DAVIS V. SIG SAUER**

421.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

422.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

423.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Davis, entitling Davis to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XIX – NEGLIGENCE
**RUSSELL DYKEMA V. SIG SAUER**

424.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

425.    At all relevant times, Sig Sauer owed Dykema the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

426.    At all relevant times, Sig Sauer owed Dykema the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

427.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Dykema, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

428.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Dykema, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix. By including a defective and improper holster in the original packaging with the gun;

x. By misrepresenting the dangers and hazards posed by the gun;

xi. By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s' competitors;

xiv. Other negligent acts and omissions to be developed in the course of discovery.

429. Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

430. The gun's defective condition was not visible, and Dykema was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

431. Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 29, 2022, unintended discharge and Dykema's resultant injuries.

432.    As a direct and proximate result of the negligence set forth in this Count, Dykema suffered mental anguish, inconvenience, loss of the capacity for the enjoyment of life, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These emotional injuries are either permanent or continuing in their nature and Doffeny will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and againstSig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XX - STRICT PRODUCT LIABILITY
### RUSSELL DYKEMA V. SIG SAUER

433.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

434.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

435.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

436.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

437.    The defective condition of the P320 caused Plaintiff's injuries.

438.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXI – VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### RUSSELL DYKEMA V. SIG SAUER

439.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

440.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

441.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Dykema, entitling Dykema to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXII – NEGLIGENCE
## STEPHEN FERNANDEZ V. SIG SAUER

442.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

443.    At all relevant times, Sig Sauer owed Fernandez the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

444.    At all relevant times, Sig Sauer owed Fernandez the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

445.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Fernandez, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

446.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by

omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.   By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.   By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Fernandez, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.   By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the
course of discovery.

447.    Sig Sauer knew, or should have known, that exposing users to the dangerous and
defective and hazardous conditions existing in the gun would or could give rise to serious bodily
injuries to such users, up to and including death.

448.    The gun's defective condition was not visible, and Fernandez was not capable of
realizing the dangerous condition and could not have discovered the dangerous condition even
upon performing a reasonable inspection of the same.

449.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused
the October 11, 2021, unintended discharge and Fernandez's resultant injuries.

450.    As a direct and proximate result of the negligence set forth in this Count, Fernandez
suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the
enjoyment of life, physical deformity and handicap and embarrassment associated with the same,
loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for
his care and treatment.  These injuries are either permanent or continuing in their nature and
Fernandez will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for
compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,
costs of suit, and all other claims available by law.

## COUNT XXIII - STRICT PRODUCT LIABILITY
### STEPHEN FERNANDEZ V. SIG SAUER

451.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth
herein.

452.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

453.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

454.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

455.    The defective condition of the P320 caused Plaintiff's injuries.

456.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXIV – VIOLATION OF NEW HAMPSHIRE \
## CONSUMER PROTECTION ACT
### STEPHEN FERNANDEZ V. SIG SAUER

457.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

458.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

459.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Fernandez, entitling Fernandez to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXV – NEGLIGENCE
### RODNEY GASTON V. SIG SAUER

460.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

461.    At all relevant times, Sig Sauer owed Gaston the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

462.    At all relevant times, Sig Sauer owed Gaston the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

463.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Gaston, of known or suspected defects that rendered

the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

464.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Gaston, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

     viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

     ix.    By including a defective and improper holster in the original packaging with the gun;

     x.    By misrepresenting the dangers and hazards posed by the gun;

     xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

     xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

     xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

     xiv.    Other negligent acts and omissions to be developed in the course of discovery.

465.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

466.    The gun's defective condition was not visible, and Gaston was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

467.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 10, 2022, unintended discharge and Gaston's resultant injuries.

468.    As a direct and proximate result of the negligence set forth in this Count, Gaston suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same,

loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Gaston will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XXVI - STRICT PRODUCT LIABILITY
### RODNEY GASTON V. SIG SAUER

469.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

470.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

471.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

472.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

473.     The defective condition of the P320 caused Plaintiff's injuries.

474.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>**COUNT XXVII – VIOLATION OF NEW HAMPSHIRE**</u>
<u>**CONSUMER PROTECTION ACT**</u>
**RODNEY GASTON V. SIG SAUER**

475.     Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

476.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

477.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Gaston, entitling Gaston to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

<u>**COUNT XXVIII – NEGLIGENCE**</u>
**CORDELL HAMILTON V. SIG SAUER**

478.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

479.   At all relevant times, Sig Sauer owed Hamilton the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

480.   At all relevant times, Sig Sauer owed Hamilton the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

481.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Hamilton, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

482.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.   By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.   By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.   By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

90

v.  By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.  By negligently failing to unambiguously warn purchasers and end users of the gun, including Hamilton, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.  By including a defective and improper holster in the original packaging with the gun;

x.  By misrepresenting the dangers and hazards posed by the gun;

xi.  By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.  By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.  Other negligent acts and omissions to be developed in the course of discovery.

483.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

484.   The gun's defective condition was not visible, and Hamilton was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

485.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the March 27, 2022, unintended discharge and Hamilton's resultant injuries.

486.   As a direct and proximate result of the negligence set forth in this Count, Hamilton suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Hamilton will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXIX - STRICT PRODUCT LIABILITY
### CORDELL HAMILTON V. SIG SAUER

487.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

488.   Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

489.  The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

490.  Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

491.  The defective condition of the P320 caused Plaintiff's injuries.

492.  Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT XXX – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT CORDELL HAMILTON V. SIG SAUER

493.  Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

494.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

495.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Hamilton, entitling Hamilton to mandatory doubling and discretionary trebling of her actual damages, as well as her reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXI – NEGLIGENCE
## MARCOS HERNANDEZ V. SIG SAUER

496.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

497.    At all relevant times, Sig Sauer owed Hernandez the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

498.    At all relevant times, Sig Sauer owed Hernandez the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

499.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Hernandez, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal

and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

500.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Hernandez, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the

user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.     Other negligent acts and omissions to be developed in the course of discovery.

501.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

502.    The gun's defective condition was not visible, and Hernandez was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

503.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the January 24, 2023, unintended discharge and Hernandez' resultant injuries.

504.    As a direct and proximate result of the negligence set forth in this Count, Hernandez suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for

his care and treatment. These injuries are either permanent or continuing in their nature and Hernandez will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXII - STRICT PRODUCT LIABILITY
### MARCOS HERNANDEZ V. SIG SAUER

505. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

506. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

507. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

508.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

509.    The defective condition of the P320 caused Plaintiff's injuries.

510.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXIII – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### MARCOS HERNANDEZ V. SIG SAUER

511.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

512.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

513.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Hernandez, entitling Hernandez to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXIV – NEGLIGENCE
### CODY HIGGINS V. SIG SAUER

514.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

515.    At all relevant times, Sig Sauer owed Higgins the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

516.    At all relevant times, Sig Sauer owed Higgins the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

517.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Higgins, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

518.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

      ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.      By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.      By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.      By negligently failing to unambiguously warn purchasers and end users of the gun, including Higgins, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    vii.      By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

    viii.      By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

    ix.      By including a defective and improper holster in the original packaging with the gun;

    x.      By misrepresenting the dangers and hazards posed by the gun;

    xi.      By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

    xii.      By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors;

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

519.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

520.   The gun's defective condition was not visible, and Higgins was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

521.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 13, 2022, unintended discharge and Higgins' resultant injuries.

522.   As a direct and proximate result of the negligence set forth in this Count, Higgins suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Higgins will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXV - STRICT PRODUCT LIABILITY
### CODY HIGGINS V. SIG SAUER

523.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

524.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

      a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

      b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

      c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

      d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

525.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

526.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

527.    The defective condition of the P320 caused Plaintiff's injuries.

528.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVI – VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### CODY HIGGINS V. SIG SAUER

529.     Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

530.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

531.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Higgins, entitling Higgins to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVII – NEGLIGENCE
### CHARLES LASKEY-CASTLE V. SIG SAUER

532.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

533.     At all relevant times, Sig Sauer owed Laskey-Castle the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

534.     At all relevant times, Sig Sauer owed Laskey-Castle the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

535.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Laskey-Castle, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

536.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Laskey-Castle of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix. By including a defective and improper holster in the original packaging with the gun;

x. By misrepresenting the dangers and hazards posed by the gun;

xi. By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii. By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii. By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv. Other negligent acts and omissions to be developed in the course of discovery.

537. Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

538. The gun's defective condition was not visible, and Laskey-Castle was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

539. Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the September 10, 2022 unintended discharge of Officer Lee's P320 and resultant injuries caused to Laskey-Castle.

540.     As a direct and proximate result of the negligence set forth in this Count, Laskey-Castle suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Laskey-Castle will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXVIII - STRICT PRODUCT LIABILITY
## CHARLES LASKEY-CASTLE V. SIG SAUER

541.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

542.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

543.     The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

544.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

545.     The defective condition of the P320 caused Plaintiff's injuries.

546.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XXXIX- VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### CHARLES LASKEY-CASTLE V. SIG SAUER

547.     Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

548.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

549.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Laskey-Castle, entitling Laskey-Castle to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XL – NEGLIGENCE
### MICHAEL LINGO V. SIG SAUER

550. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

551. At all relevant times, Sig Sauer owed Lingo the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

552. At all relevant times, Sig Sauer owed Lingo the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

553. At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Lingo, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

554. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i. By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii. By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.   By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.   By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Lingo, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.   By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

555.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

556.   The gun's defective condition was not visible, and Lingo was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

557.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the January 7, 2023, unintended discharge and Lingo's resultant injuries.

558.   As a direct and proximate result of the negligence set forth in this Count, Lingo suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Lingo will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLI - STRICT PRODUCT LIABILITY
### MICHAEL LINGO V. SIG SAUER

559.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

560.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

561.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

562.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

563.    The defective condition of the P320 caused Plaintiff's injuries.

564.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLII - VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### MICHAEL LINGO V. SIG SAUER

565.     Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

566.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

567.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Lingo, entitling Lingo to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIII– NEGLIGENCE
### JOHN McARTOR V. SIG SAUER

568.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

569.     At all relevant times, Sig Sauer owed McArtor the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

570.     At all relevant times, Sig Sauer owed McArtor the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

571. At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including McArtor, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

572. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.   By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

    v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including McArtor, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

    vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

113

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

573.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

574.    The gun's defective condition was not visible, and McArtor was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

575.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the July 19, 2022, unintended discharge and McArtor's resultant injuries.

114

576.     As a direct and proximate result of the negligence set forth in this Count, McArtor suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and McArtor will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIV - STRICT PRODUCT LIABILITY
### JOHN McARTOR V. SIG SAUER

577.     Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

578.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

579.     The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

580.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

581.     The defective condition of the P320 caused Plaintiff's injuries.

582.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLV – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### JOHN McARTOR V. SIG SAUER

583.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

584.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

585.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to McArtor, entitling McArtor to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

<div align="center">

**COUNT XLVI – NEGLIGENCE**
**BRIAN TENNANT V. SIG SAUER**

</div>

586.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

587.     At all relevant times, Sig Sauer owed Tennant the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

588.     At all relevant times, Sig Sauer owed Tennant the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

589.     At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Tennant, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

590.     Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

    i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

<div align="center">117</div>

iii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Tennant, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.     By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

591.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

592.    The gun's defective condition was not visible, and Tennant was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

593.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the January 1, 2020, unintended discharge and Tennant's resultant injuries.

594.    As a direct and proximate result of the negligence set forth in this Count, Tennant suffered severe injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Tennant will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVII - STRICT PRODUCT LIABILITY
**BRIAN TENNANT V. SIG SAUER**

595.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

596. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

597. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

598. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

599. The defective condition of the P320 caused Plaintiff's injuries.

600. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLVIII – VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
### BRIAN TENNANT V. SIG SAUER

601.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

602.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

603.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Tennant, entitling Tennant to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT XLIX – NEGLIGENCE
### PAULO JACUZZI V. SIG SAUER

604.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

605.    At all relevant times, Sig Sauer owed Jacuzzi the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

606.    At all relevant times, Sig Sauer owed Jacuzzi the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

607.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Jacuzzi, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

608.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Jacuzzi, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.   By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

609.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

610.   The gun's defective condition was not visible, and Jacuzzi was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

611.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 26, 2022, unintended discharge and Jacuzzi's resultant injuries.

612.    As a direct and proximate result of the negligence set forth in this Count, Jacuzzi suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Jacuzzi will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT L - STRICT PRODUCT LIABILITY
### PAULO JACUZZI V. SIG SAUER

613.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

614.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

615. The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

616. Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

617. The defective condition of the P320 caused Plaintiff's injuries.

618. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LI– VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT
### PAULO JACUZZI V. SIG SAUER

619. Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

620. By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

621. Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Jacuzzi, entitling Jacuzzi to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LII – NEGLIGENCE
### MELVIN RIVERA V. SIG SAUER

622. Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

623. At all relevant times, Sig Sauer owed Rivera the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

624. At all relevant times, Sig Sauer owed Rivera the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

625. At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Rivera, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

626. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

  i.   By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

  ii.  By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.  By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.  By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.  By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.  By negligently failing to unambiguously warn purchasers and end users of the gun, including Rivera, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.  By including a defective and improper holster in the original packaging with the gun;

x.  By misrepresenting the dangers and hazards posed by the gun;

xi.  By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

627.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

628.   The gun's defective condition was not visible, and Rivera was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

629.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the October 18, 2022, unintended discharge and Rivera's resultant injuries.

630.   As a direct and proximate result of the negligence set forth in this Count, Rivera suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature and Rivera will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LIII - STRICT PRODUCT LIABILITY
### MELVIN RIVERA V. SIG SAUER

631.   Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

632.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

633.     The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

634.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

635.     The defective condition of the P320 caused Plaintiff's injuries.

636.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LIV – VIOLATION OF NEW HAMPSHIRE
## CONSUMER PROTECTION ACT
## MELVIN RIVERA V. SIG SAUER

637.     Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

638.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

639.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Rivera, entitling Rivera to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LV – NEGLIGENCE
## TIMOTHY RZASA V. SIG SAUER

640.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

641.     At all relevant times, Sig Sauer owed Rzasa the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

642.     At all relevant times, Sig Sauer owed Rzasa the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

643.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Rzasa, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

644.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.    By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Rzasa, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the

        possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

645.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

646.    The gun's defective condition was not visible, and Rzasa was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

647.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the July 31, 2021 unintended discharge and Rzasa's resultant injuries.

648. As a direct and proximate result of the negligence set forth in this Count, Rzasa suffered auditory injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Rzasa will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVI- STRICT PRODUCT LIABILITY
### TIMOTHY RZASA V. SIG SAUER

649. Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

650. Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

  a. Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

  b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

  c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

  d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

651.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

652.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

653.    The defective condition of the P320 caused Plaintiff's injuries.

654.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVII – VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### TIMOTHY RZASA V. SIG SAUER

655.    Plaintiff adopts all preceding Paragraphs as if fully incorporated herein.

656.    By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

657.    Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Rzasa, entitling Rzasa to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LVIII – NEGLIGENCE
### CHRISTIAN WUOLLET V. SIG SAUER

658.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

659.    At all relevant times, Sig Sauer owed Wuollet the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

660.    At all relevant times, Sig Sauer owed Wuollet the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

661.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Wuollet, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

662.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

      i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

      ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.  By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.  By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.  By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.  By negligently failing to unambiguously warn purchasers and end users of the gun, including Wuollet, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.  By including a defective and improper holster in the original packaging with the gun;

x.  By misrepresenting the dangers and hazards posed by the gun;

xi.  By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.  By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

136

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

663.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

664.    The gun's defective condition was not visible, and Wuollet was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

665.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the April 14, 2022, unintended discharge and Wuollet's resultant injuries.

666.    As a direct and proximate result of the negligence set forth in this Count, Wuollet suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Wuollet will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against the Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT LIX - STRICT PRODUCT LIABILITY
### CHRISTIAN WUOLLET V. SIG SAUER

667.    Plaintiff re-adopts and re-allege all paragraphs of this pleading as if fully set forth herein.

668.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

669.     The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

670.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

671.     The defective condition of the P320 caused Plaintiff's injuries.

672.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT LX – VIOLATION OF NEW HAMPSHIRE**
**CONSUMER PROTECTION ACT**
**CHRISTIAN WUOLLET V. SIG SAUER**

673.     Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

674.     By its actions, described in detail in this Complaint, Sig Sauer has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

675.     Sig Sauer's actions have been willing and knowing, and the direct and proximate cause of substantial damages to Wuollet, entitling Wuollet to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney fees.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT LXI – LOSS OF CONSORTIUM**
**HEATHER DYKEMA V. SIG SAUER**

676.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

677.     At all relevant times hereto, Plaintiff, Heather Dykema, was the lawfully wedded wife of husband-plaintiff, Russell Dykema, with whom she lives.

678.     As a result of the injuries sustained by Mr. Dykema, wife-plaintiff Mrs. Dykema has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

## COUNT LXII – LOSS OF CONSORTIUM
### ASHLEY RENAE HIGGINS V. SIG SAUER

679.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

680.     At all relevant times hereto, Plaintiff, Ashley Renae Higgins, was the lawfully wedded wife of husband-plaintiff, Cody Higgins, with whom she lives.

681.     As a result of the injuries sustained by Mr. Higgins, wife-plaintiff Mrs. Higgins has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff, demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXIII – LOSS OF CONSORTIUM
### ROSARIO McARTOR V. SIG SAUER

682.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

683.     At all relevant times hereto, Plaintiff, Rosario McArtor, was the lawfully wedded wife of husband-plaintiff, John McArtor, with whom she lives.

684.     As a result of the injuries sustained by Mr. McArtor, wife-plaintiff Mrs. McArtor, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

## COUNT LXIV – LOSS OF CONSORTIUM
### JENNIFER JACUZZI V. SIG SAUER

685.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

686.    At all relevant times hereto, Plaintiff, Jennifer Jacuzzi, was the lawfully wedded wife of Paulo Jacuzzi, with whom she lives.

687.    As a result of the injuries sustained by Mr. Jacuzzi, wife-plaintiff Jennifer Jacuzzi, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXV – LOSS OF CONSORTIUM
### LEIGHA FAITH WUOLLET V. SIG SAUER

688.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

689.    At all relevant times hereto, Plaintiff, Leigha Faith Wuollet, was the lawfully wedded wife of husband-plaintiff, Christian Wuollet, with whom she lives.

690.    As a result of the injuries sustained by Mr. Wuollet, wife-plaintiff Leigha Faith Wuollet has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

## COUNT LXVI – LOSS OF CONSORTIUM
### ANGELA MARIE CAMPBELL V. SIG SAUER

691.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

692.     At all relevant times hereto, Plaintiff, Angela Marie Campbell, was the lawfully wedded wife of husband-plaintiff, William Campbell, with whom she lives.

693.     As a result of the injuries sustained by Mr. Campbell, wife-plaintiff Mrs. Campbell, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXVII – LOSS OF CONSORTIUM
### EHREN TENNANT V. SIG SAUER

694.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

695.     At all relevant times hereto, Plaintiff, Ehren Tennant, was the lawfully wedded wife of husband-plaintiff, Brian Tennant, with whom she lives.

696.     As a result of the injuries sustained by Mr. Tennant, wife-plaintiff Ehren Tennant, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

## COUNT LXVIII – LOSS OF CONSORTIUM
### TRAVIS LEE MCQUEEN V. SIG SAUER

697.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

698.     At all relevant times hereto, Plaintiff, Travis Lee McQueen, was the lawfully wedded husband of wife-plaintiff, Erin Cooper, with whom he lives.

699.          As a result of the injuries sustained by Mrs. Cooper, husband-plaintiff Mr. McQueen has been and will continue to be deprived of the love, assistance, companionship, consortium and society of his wife, all to his great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT LXIX – LOSS OF CONSORTIUM
### KERI DAWN CUASITO V. SIG SAUER

700.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

701.     At all relevant times hereto, Plaintiff, Keri Dawn Cuasito, was the lawfully wedded wife of husband-plaintiff, Wendell Cuasito, with whom she lives.

702.     As a result of the injuries sustained by Mr. Cuasito, wife-plaintiff Mrs. Cuasito has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees,

costs of suit, and all other claims available by law.

## COUNT LXXX – LOSS OF CONSORTIUM
### YASMIN RIVERA V. SIG SAUER

703.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

704.    At all relevant times hereto, Plaintiff, Yasmin Rivera, was the lawfully wedded wife of husband-plaintiff, Melvin Rivera, with whom she lives.

705.    As a result of the injuries sustained by Mr. Rivera, wife-plaintiff Mrs. Rivera has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

Date:  March 27, 2023          By:    */s/ Robert Mongeluzzi*
ROBERT MONGELUZZI, PA Bar #36283
LARRY BENDESKY, PA Bar # 51026
ROBERT W. ZIMMERMAN, PA Bar #208410
DANIEL L. CEISLER, PA Bar #326798
RYAN D. HURD, PA Bar #205955
*Pro Hac Vice Applications to be filed*
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
(215) 496-8282
rmongeluzzi@smbb.com
lbendesky@smbb.com
rzimmerman@smbb.com
dceisler@smbb.com
rhurd@smbb.com

and

**DOUGLAS, LEONARD & GARVEY, P.C.**

Date:  March 27, 2023            By:    */s/ Benjamin T King*
                                        BENJAMIN T. KING, NH Bar #12888
                                        14 South Street, Suite 5
                                        Concord, NH 03301
                                        (603) 224-1988
                                        benjamin@nhlawoffice.com